GROVES *v.* THE STATE.

38

*H. H. Merry* and *Alexander & Jones,* for plaintiff in error.

*George M. Napier, attorney-general, G. C. Spurlin, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

BECK, P. J. Joe Groves and others were jointly indicted for the offense of murder. Joe Groves alone was put upon trial, and the jury returned a verdict of guilty without a recommendation. He thereupon filed a motion for a new trial, which was overruled, and he excepted.

Three officers, including H. A. White, a deputy sheriff, with whose murder the accused is charged, and one other person approached a house, a small, lonely, and dilapidated building, about 100 yards from the road, for the purpose of arresting the defendant under a warrant which White had in his possession. There were several people in the house, including the father, the mother, and the sisters of Joe Groves, the defendant. White knocked and kicked on the front door of the little house, announced that he had a warrant, and, upon receiving no response, went to the back door, where the other officers were, and they then pushed the door open and entered. Two of the women in the house laid hold of White and he pushed them back. About that time a shot was fired by some one in the house, and White was mortally wounded, dying in a short time afterwards. Joe Groves, if he was in the house at that time, escaped. In his statement he claimed that he was not present and knew nothing of the matter, and introduced testimony to prove an alibi.

In one ground of the motion for a new trial error is assigned upon failure of the court to give in charge to the jury, without written request, section 74 of the Penal Code, which reads as follows: "Parents and children may mutually protect each other, and justify the defense of the person or reputation of each other." The failure of the court so to charge was not error. There was no evidence in this case requiring that this section should be given in charge, or which would have authorized instructions to the jury based upon

this section. White was an officer, or at that time was acting as an officer in connection with two deputy sheriffs. He had a warrant for the arrest of Joe Groves. Ruby Groves, the sister of Joe, and a witness for the defendant, testified: "I am ten years old, and I was in the house on the night that a man [Mr. White] got shot. My father was there that night. The people in the room were my mother and my sister and my sister-in-law and my father and me and the baby. They all went to bed there and went to sleep there. I slept with my mother. Joe Groves' wife slept with her baby; my sister slept on the other bed; my father slept on the springs on the floor behind the door. There were four beds in that room. I was asleep when the shooting occurred. Joe Groves is my brother." And F. M. Beckham, a witness for the State, testified: "I went in the house with him [White] and was standing by him when he was shot. When we got there Mr. White went to the front door and I went to the back. At the front door he called Joe and told him to come to the door. The house was shut up and neither Joe nor any one else answered. When Mr. White could not get an entrance at the front door he came around to the back door. It was a wooden door and was closed. He pushed the door back. There was no light in the house. It was about two o'clock in the morning. I heard what sounded like some one whispering in the house before I got around to the back door. He went in through the kitchen, and I went into the kitchen with him as far as the partition door. When he left the kitchen he made one step inside the bedroom. We both had our lights (flashlights) in there when he pushed the door open, and there were two women standing there about the middle of the house. They were Joe's mother and his sister. The old lady ran to the door and started to push it to. Mr. White pushed it open. The girl grabbed him on his arm here, and he pushed them back. They shoved him back a step, which was just a step inside the bed-room door, and when they shoved him back the shot fired. At the time the shot fired the two women had hold of him, and it looked like they were trying to shove him back out. I am not a deputy sheriff, and had no authority as an officer that evening when I went there with Mr. White. Mr. Jim Stewart, Mr. Hough, Mr. White, and myself left Thomasville in the car and went straight to this Groves home, this place where these women were living. The road is about 100 yards from the house. It is a very old shack set out

in an old field grown up in young pines and broom-sedge and tall weeds. We all went up to the front of the house in a bunch. When Mr. White was at the front door, before he came around to where I was, I heard him kicking on it, banging on it. It sounded like he was kicking on it. Then he came to the back door, which was a wooden door which slides in a groove, and opened it. He walked up and pushed the middle door open. I had a hickory stick in my hand, just the common size of a walking stick."

It is contended by movant, that, "in view of the fact that the State's case rested wholly on circumstantial evidence, and in view of the fact that there was positive testimony that there were in the room at the time of the homicide the mother, the two sisters, the wife and the child of the defendant, and that a man was also in the room, and in view of the fact that there was positive testimony that the father and husband of members of this group was at that house that night and went to sleep on the bed behind the door, the jury should have been instructed as to the law of mutual protection as set out in section 74 of the Penal Code; and movant contends that a failure to so instruct the jury deprived them of a knowledge of their right to consider mutual protection as a motive for homicide." There is nothing in the evidence that authorized the court to charge section 74 of the Penal Code. White had done nothing that required any one to defend his mother, his sister, or his child. It is true that White had entered the house, and it was at night; but he had announced that he had a warrant for Joe Groves' arrest; and when he came into the house, it appears from other parts of the evidence that one of the women who had seized him and whom he pushed back told him that if he had a warrant she wanted it read, and he told her he would read it. No chance was given to him to read it. He was shot down without being given an opportunity to read the document. As we have said, he had the right to enter the house. He had the right when he first went to the front door, after a declaration that showed he was there for the lawful purpose of executing a warrant for the arrest of Joe Groves, to burst the door open and enter the house by force. In section 915 of the Penal Code it is declared: "In order to arrest under a warrant charging a crime, the officer may break open the door of any house where the offender is concealed." And § 916 is as follows: "Every officer is bound to execute the penal warrants placed in his hands, and

to that end he may summon to his assistance, either in writing or verbally, any of the citizens of the neighborhood or county. As the posse of such officer, their acts shall be subject to the same protection and consequences as official acts." Of course an officer in approaching a house at night for the arrest of any person in the house should announce the character in which he is acting. Here the inmates of the house were repeatedly warned that White had the warrant. There is nothing in the evidence to show that White used unusual or unnecessary force, or that anything that he did was a menace to any other person in the house; and nothing that he did could have excited the fears of a reasonable man that he was about to commit any unlawful act or trespass against any of the inmates. And consequently the court did not err in refusing to give in charge to the jury, the code section referred to.

The court did not err in admitting in evidence the testimony of one Gordon, a witness for the State, in part as follows: "Last year and part of this I was working under the sheriff and as constable in Colquitt County. I think I have seen this warrant you hand me, sworn out by H. L. Kennedy against Joe Groves, before. I tried to arrest the defendant under this warrant. Mr. Vick got after him back down there in a field, and I was by the bridge, and when I seen him start I went to cut him off. He ran towards the house where I suppose he was staying. I was near the house. Mr. Vick came along. I was closer than Mr. Vick was to him, and he ran in the house and when he came out he come with a double-barrel shotgun. He said, 'Stop. If you don't stop, I will kill you.' That was some time last year." The ground of the motion complaining that this evidence was illegally admitted fails to state for what crime the warrant referred to was issued. It is inferable from all the evidence that this is the same warrant that White had in his possession when he was shot. If it was not, this should have been stated in the ground of the motion, so that this court would know whether it was the same one. But pretermitting discussion of that question, and without holding that it was the same one, the evidence was nevertheless admissible. It tended to show that the year before the trial, and in the year of the trial, the accused in this case evaded arrest under a warrant charging him with a crime, and continued to evade arrest and threatened to kill the man who was attempting to arrest him; and it tends to throw light upon the question as to

whether or not the accused had motive for shooting the deceased, who was there to effect a lawful arrest. If it was the same warrant that White was attempting to execute on the night he was shot, of course it was admissible. If it was a different warrant, as we have said above, it tended to illustrate the question of motive.

■ Rufus Clark, a witness for the State, had testified to material facts in the case. For the purpose of impeaching him, the defendant offered in evidence an indictment and plea of guilty by this witness in the superior court of Thomas County. The charge contained in the indictment was that Rufus Clark did unlawfully appear in a drunken and intoxicated condition on a certain highway in the county, which was used and traveled by the public; that his intoxication was made manifest by his boisterous and indecent condition and action and his profane and unbecoming language, etc. The court did not err in excluding this evidence. Such a charge as that indicated in the indictment was not one involving moral turpitude. "A witness can not be impeached by introducing a record of his conviction for misdemeanor, it not appearing that the offense for which he was found guilty was one involving moral turpitude." *Andrews* v. *State,* 118 *Ga.* 1 (43 S. E. 852); *Howard* v. *State,* 144 *Ga.* 169 (86 S. E. 540).

■■ The rulings stated in headnotes 4 and 5 require no elaboration.

■ Exception is taken to the following charge of the court: "If you believe from the evidence in this case that the defendant, in the County of Thomas, on or about the time named in the indictment (when I say the defendant I make reference to Joe Groves), if you believe that he on or about the time named in the indictment, in the County of Thomas, he alone or in conjunction with any one or more or all or any of the defendants alleged and charged with him in the indictment, present, aiding and abetting, if you believe that he with any one or more or all, unlawfully, with malice and with a certain pistol shot and killed H. A. White as alleged, you would be authorized to find the defendant, Joe Groves, guilty. If you fail to find the truth of that, you would acquit him." This charge is not error for any of the reasons assigned.

*Judgment affirmed. Atkinson, Hill, and Gilbert, JJ., concur. Russell, C. J., dissents.*