## S04A0151. AL-AMIN v. THE STATE.
(597 SE2d 332)

THOMPSON, Justice.

Jamil Abdullah Al-Amin was convicted of malice murder and various other offenses stemming from the shooting of two Fulton County Deputy Sheriffs, that resulted in the death of one and injury to the other.[1] The State sought the death penalty, but a jury returned a sentence of life without possibility of parole, and judgment was entered accordingly. Finding no reversible error, we affirm.

1. On appeal from a criminal conviction, we view the evidence in a light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence. *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998). We do not weigh the evidence or determine witness credibility, but only determine if the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

So viewed, the evidence established that Fulton County Deputy Sheriffs Aldranon English and Ricky Kinchen went to the home of Al-Amin in the West End community of Atlanta to execute a bench warrant for his arrest issued by Cobb County Superior Court.[2] The warrant was issued when Al-Amin failed to appear at an arraignment in that court to answer charges of theft by receiving stolen property, impersonating an officer, and operating a motor vehicle without proof of insurance. The Fulton County deputies were in uniform with their badges displayed and they were driving a marked Fulton County Sheriff's patrol car.

Al-Amin's residence was unlit and it appeared to the deputies that he was not at home. Instead of possibly "blowing the warrant" by alerting neighbors of their attempt to find the subject, the deputies

---

[1] The crimes took place on March 16, 2000. On March 28, 2000, Al-Amin was charged in a 13-count indictment with malice murder, felony murder (four counts), aggravated assault on a peace officer (two counts), obstruction of a law enforcement officer (two counts), aggravated battery on a peace officer, possession of a firearm by a convicted felon, and possession of a firearm in the commission of a felony (two counts). The State sought the death penalty. Voir dire commenced on January 22, 2002, and on March 9, 2002, Al-Amin was found guilty of all counts. At the conclusion of the sentencing phase on March 13, 2002, the jury fixed punishment at life without possibility of parole. Al-Amin was sentenced accordingly on the same day. He filed a timely motion for new trial, which was amended on December 10 and 13, 2002, and denied on July 2, 2003. A notice of appeal was filed on July 18, 2003, and the case was docketed in this Court on September 26, 2003. Oral argument was heard on January 27, 2004.

[2] Al-Amin served as an Iman (prayer leader) at a Muslim Masjid (house of worship) which was established in a small renovated house. The address on the warrant which Al-Amin listed with Cobb County authorities as his residence, is the same location as the Masjid.

decided to leave the area.[3] They had driven a short distance when they saw a black car pull up and park near Al-Amin's residence, and they observed a man exit the vehicle. Although it was after dark, the street lights provided good illumination so that the deputies were able to discern that the individual, dressed in Muslim attire, appeared to fit the description of their subject as provided in the warrant. Deputy Kinchen made a U-turn, drove toward Al-Amin's residence, and parked the patrol car nose-to-nose with Al-Amin's vehicle, a black Mercedes-Benz. Al-Amin stood next to his vehicle and kept his gaze on the patrol car as it approached; his left hand was on his car door and he held a brown bag in his right hand. Deputy English exited from the passenger side and walked toward Al-Amin; the officer had not drawn his service revolver. Deputy Kinchen simultaneously exited the patrol car from the driver's side; he was to provide cover for his partner. Deputy English directed that Al-Amin place his right hand in view, whereupon Al-Amin suddenly produced an assault rifle and began firing at the two officers. After shooting both deputies numerous times, using both the assault rifle and a pistol, Al-Amin drove away from the scene.

A neighbor who heard repeated gunfire called 911 and reported that there was an officer down in the street begging for his life. The neighbor described a dark-colored vehicle (he believed to be a Cadillac) speed away from the scene.

Deputy English radioed for help and alerted the dispatcher that the perpetrator left the scene in a black Mercedes. When police arrived at the scene, Deputy Kinchen was able to describe his assailant as an African-American male, 6'4'' in height, wearing a long trenchcoat, a "beanie" type hat, and armed with an assault rifle.

The next day Deputy English gave the investigating officers a statement describing the events, and he identified Al-Amin in a photo line-up. Later that afternoon, Deputy Kinchen died from his injuries. A Fulton County warrant was issued for the arrest of Al-Amin on charges of murder, aggravated assault, and other crimes stemming from the shooting. In addition, federal authorities, acting on information that Al-Amin had left Georgia, issued a warrant for unlawful flight to avoid prosecution (UFAP warrant).

Within a day of the shooting, federal authorities received information that Al-Amin might have fled to Whitehall, Alabama; a multi-agency surveillance team was deployed to that area. On the

---

[3] This was their second attempt; Deputy English along with a second deputy had been to Al-Amin's residence to execute the Cobb County warrant one week earlier. On that occasion, it also appeared that the residence was unoccupied, and the deputies left.

fourth day after the shooting, Al-Amin was spotted on foot in White-hall by a team of three United States marshals who were part of the surveillance operation. When the uniformed marshals observed Al-Amin walk toward a wooded area, they exited their vehicle and identified themselves as law enforcement officers. Al-Amin immediately opened fire on them, and then retreated into the woods; the marshals were uninjured.

Al-Amin was captured about three hours later after a team of tracking dogs was brought in to assist in the search. He was wearing a bulletproof vest, and he had in his possession a wallet containing $1,000 in cash and three driver's licenses issued in his name by three different states. In the vicinity, officers located a .9 millimeter pistol, holster, belt, a magazine of .9 millimeter ammunition, and a piece of fabric on a barbed wire fence that had been torn from the shirt Al-Amin was wearing. The next morning, officers conducted a further search of the area and located the following: several .223 caliber shell casings (both expended and live); a green canvas bag containing a cellular phone, clothing, a magazine containing .223 ammunition, and the registration documents for a Mercedes-Benz automobile showing Al-Amin as owner and reflecting his Fulton County address; a brown day planner containing a bank statement issued to Al-Amin at the same address; and a .223 caliber semi-automatic Ruger assault rifle and two magazines of .223 ammunition.

Nine days after Al-Amin's arrest, his black Mercedes automobile was recovered on private property in the Whitehall area; the license plate was found in a nearby shed. Numerous bullet holes were visible on the car. Bullets which had been fired from the service revolvers of both Deputies Kinchen and English were removed from the wheel rim, frame, windshield, and rear seat of the vehicle.

Ballistics evidence also established that two .9 millimeter metal jacket bullets which had been removed from Deputy Kinchen's abdomen and femur had been fired from the .9 millimeter pistol recovered at the time of Al-Amin's arrest in Whitehall. It was also shown that shell casings collected from the site of the Fulton County shootings had been ejected from that weapon. Numerous .223 caliber cartridge casings collected both at the site of the Fulton County shootings and in the vicinity of Al-Amin's arrest, had been ejected from the .223 caliber Ruger rifle found along with Al-Amin's personal belongings on the morning after his arrest in Whitehall.

The evidence was sufficient for a rational trier of fact to have found Al-Amin guilty of the crimes for which he was convicted. *Jackson v. Virginia*, supra.

2. Al-Amin claims that his constitutional right to equal protection, as well as the statutory procedures for selecting grand juries, were violated because the grand jury wheel from which his grand

jurors were selected was "forced balanced" by selecting people based on race, gender, and age.

Evidence presented at a pretrial hearing showed that the voter registration list for Fulton County was the sole source for the master grand jury list from which the grand jury in this case was summoned; and because African-Americans in Fulton County do not register to vote at the same rate as Caucasians, a random selection from the voter registration list did not result in a master grand jury wheel which accurately represented the age-eligible African-American community. To remedy this disparity, and to ensure compliance with the Unified Appeal Procedure (UAP) applicable in a death penalty prosecution, jury commissioners employed the process of "forced balancing."[4] A computer was instructed to pick names of potential grand jurors from the voter registration list based on race, gender, and age in order to comply with the five percentage point requirements of UAP II (E).

The statutory procedures for creating the grand jury list are found at OCGA § 15-12-40 et seq.[5] This Court has consistently held that the use of forced racial balancing is not violative of a defendant's statutory rights. See *Ramirez v. State*, 276 Ga. 158 (1) (575 SE2d 462) (2003) (Court approved a grand jury selection procedure fixing the percentage of African-American persons on the grand jury source list to the percentage of African-American persons in the county as reported in the most recent census in accordance with the requirements of the UAP); *Yates v. State*, 274 Ga. 312 (5) (553 SE2d 563) (2001) (Court approved forced balancing to ensure that the racial balance in a grand or traverse jury pool reflects the racial balance in the county population); and *Gissendaner v. State*, 272 Ga. 704 (5) (532 SE2d 677) (2000) (forced racial balancing is not unlawful).

Al-Amin further asserts that the process of forced balancing violates his right to equal protection. To succeed on an equal protection challenge in the context of grand jury selection, defendant must show (1) that the group is a recognizable, distinct class; (2) the degree

---

[4] Under UAP II (C) (6), a trial court in a death penalty case is required to compare the percentages of cognizable groups on the grand jury source list with the percentages of those groups in the population as measured by the most recent census, to certify that there is "no significant under-representation," and to correct any such under-representation. Under UAP II (E), the difference in those percentages must be less than five percentage points. See *Ramirez v. State*, 276 Ga. 158 (3) (575 SE2d 462) (2003).

[5] OCGA § 15-12-40 (a) was revised effective July 1, 2000, requiring jury commissioners to make use of lists of county residents who are holders of drivers' licenses, personal identification cards issued by the Department of Public Safety, registered voters lists, and other lists deemed appropriate, in compiling revisions to the grand jury and trial jury lists. At the time of Al-Amin's indictment on March 28, 2000, jury commissioners were only to look to the voter registration list in the county in composing the grand jury list, former OCGA § 15-12-40 (a).

of under-representation by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors; and (3) that the selection procedure is susceptible of abuse or is not racially neutral, thus supporting a presumption of discrimination raised by the statistics. *Castaneda v. Partida*, 430 U. S. 482 (97 SC 1272, 51 LE2d 498) (1977); *Ramirez*, supra. See also *Morrow v. State*, 272 Ga. 691 (1) (532 SE2d 78) (2000).

In *Ramirez*, supra, we rejected defendant's equal protection claim arising from the use of the county's forced balancing system. We explained that where the source list "was constructed in accordance with the [UAP], specifically with the intent to equally represent the cognizable groups in [the county] as measured by the most comprehensive and objective source available at the time the list was constructed [the 1990 census]," id. at 161, Ramirez failed to establish the third element of a prima facie claim of an equal protection violation — that the grand jury selection process was susceptible of abuse or was not racially neutral. See also *Meders v. State*, 260 Ga. 49, 56 (389 SE2d 320) (1990) (Benham, J., concurring). It follows that Al-Amin's equal protection claim fails under both the federal and Georgia constitutions.

3. Al-Amin claims that his rights to equal protection and to a fair cross-section of jurors were violated because the master grand jury wheel grid had no category for potential grand jurors 65 years and over who were neither African-American nor Caucasian, but were categorized as "other" for racial purposes. Jury commissioners testified that such individuals were not included because they represented such a small fraction of the population that even the inclusion of one would amount to over-representation. To make a prima facie showing of a fair cross-section violation as well as an equal protection violation, Al-Amin was required to show, in part, that those who are both over the age of 65 and are not African-American or Caucasian were a cognizable group; and such persons were under-represented over a significant period of time. *Ramirez*, supra at 159-161 (1) (b), (c). He has established neither.

4. Al-Amin also asserts that his right to a fair cross-section of jurors was violated by the alleged systematic and substantial under-representation of the Hispanic/Latino community in the master petit jury wheel from which his petit jurors were selected.[6]

---

[6] In *Congdon v. State*, 261 Ga. 398 (2) (405 SE2d 677) (1991), this Court acknowledged that a criminal defendant has standing to raise an equal protection claim with respect to race-based exclusions of petit jurors, whether or not the defendant and the excluded juror share the same race. The same rule applies to equal protection challenges alleging systematic exclusion of grand jurors. *Campbell v. Louisiana*, 523 U. S. 392 (118 SC 1419, 140 LE2d 551) (1998).

Evidence presented on this issue established that the *absolute disparity* of Hispanics/Latinos (the difference between the Hispanic/Latino percentage of the jury pool and the Hispanic/Latino percentage of the community) was 1.84 percent, well within constitutional requirements and the five percent permitted by the UAP. See *Cook v. State*, 255 Ga. 565 (11) (340 SE2d 843) (1986); *Smith v. State*, 275 Ga. 715 (1) (571 SE2d 740) (2002); *Morrow*, supra at 692 (1) (defendant must show "wide absolute disparity" between percentage in the population and in the jury pool). Al-Amin urges that a *comparative disparity* method be applied (the absolute disparity divided by the percentage of the Hispanic/Latino community), which would show that the age eligible and citizen eligible Hispanic/Latino community was under-represented by 67 percent. However the comparative disparity method has been expressly criticized, and we decline to apply it here. *Cook*, supra at 570 (11). See also *United States v. Pepe*, 747 F2d 632, 649 (11th Cir. 1984); *Godfrey v. Francis*, 613 FSupp. 747 (N.D. Ga. 1985).

The trial court found that Hispanic/Latino citizens were a cognizable group for Sixth Amendment fair cross-section analysis in Al-Amin's case, see *Smith*, supra at 716 (1); *Castenada*, supra, but it concluded that the evidence presented failed to demonstrate this group was systematically excluded from the jury pool. We find no error. *Morrow*, supra at 692 (1); *Smith*, supra at 716 (1).

5. Al-Amin claims that the statutory exclusion of non-citizens, OCGA § 15-12-40.1, reduced the Hispanic/Latino population in Fulton County and thus violated his fair cross-section rights under the Sixth Amendment.

A potential juror must be a citizen of the United States in order to serve. OCGA § 15-12-40.1. Therefore, eligible population statistics, not gross population figures, must be considered. Al-Amin has not established error in the composition of the jury pool on this ground. See *Smith*, supra at 723 (5).

6. Because the voter registration list was the sole source of names for the petit jury, Al-Amin asserts that the result was a substantial under-representation of African-American persons and a substantial over-representation of Caucasian persons, in violation of the Sixth Amendment and the UAP requirements.[7]

As shown previously, prior to July 1, 2000, voter lists were appropriate sources for potential jurors. Former OCGA § 15-12-40 (a). And the list required supplementation only if it failed to represent a fair cross-section of the community. See *Lipham v. State*, 257 Ga.

---

[7] His argument is premised on evidence that an inordinate portion of African-American registered voters were inactive voters, while Caucasians were over-represented on the active voter list and under-represented on the inactive list.

808 (5) (364 SE2d 840) (1988). "A defendant has no right to a jury selected from a list which perfectly mirrors the percentage structure of the community. What is required is a list which represents a fair cross-section of the community and which is not the product of intentional racial or sexual discrimination." *Cook*, supra at 573. Al-Amin has not established that use of the voter registration list fails to result in a fair cross-section of the eligible members of the community.

7. We reject the claim that reversal of Al-Amin's convictions is required because jury selection officials systematically violated statutory authority for the selection of petit jurors, as well as a court-ordered plan established pursuant to that authority, which resulted in the exclusion of eligible citizens. See OCGA § 15-12-42 (b) (1) (chief judge of the superior court may establish a plan for selection of jurors by mechanical and electronic means).

"Statutes regulating the selection, drawing, and summoning of jurors are intended to distribute jury duties among the citizens of the county, provide for rotation in jury service, and are merely directory. Obviously, however, a disregard of the essential and substantial provisions of the statute will have the effect of vitiating the array." (Punctuation omitted.) *Meders*, supra at 53. The trial court found that the jury commissioners did not violate or disregard any essential and substantial statutory provisions. We agree that the allegations of non-compliance with the plan do not constitute substantial violations and do not require reversal. We find no abuse of the trial court's discretion. Id.

8. It is asserted that the trial court erred in failing to sever the two weapons possession counts (unlawful possession of a firearm by a convicted felon, and felony murder predicated on unlawful possession of a firearm by a convicted felon), or alternatively, to order a bifurcated trial of these counts, on the basis that inclusion of these counts impermissibly placed defendant's character in issue.

The trial court correctly determined that the possession charge was material in that it served as the predicate offense for felony murder. Under such circumstances, a bifurcated trial is not required. *George v. State*, 276 Ga. 564 (3) (580 SE2d 238) (2003); *Johnson v. State*, 275 Ga. 508 (2) (570 SE2d 292) (2002); *Jones v. State*, 265 Ga. 138 (2) (454 SE2d 482) (1995). It follows that the trial court did not abuse its discretion in refusing to grant the requested relief.

9. The State introduced into evidence a cover letter attached to the Cobb County bench warrant which contained the following notation: "AGG ASSAUL; POSS ARMED." Al-Amin asserts the trial court erred in denying his motion to redact the statement which

falsely suggests that he had been charged with aggravated assault in Cobb County, and that the failure to redact impermissibly placed his character in evidence.

The document was introduced into evidence along with a limiting instruction informing the jury that both parties agree the reference to aggravated assault "was not accurate," and setting forth the correct Cobb County charges. As for the further notation that the suspect was possibly armed, the information is relevant to show that the accused had a motive for shooting the officers who were there to effect a lawful arrest. See generally *Groves v. State*, 175 Ga. 37 (2) (164 SE 822) (1932). " 'Evidence which is relevant and responsive but which minimally places the character of the defendant into issue, is nevertheless admissible where the relevance of the testimony outweighs any prejudice it may cause. (Cits.)' [Cit.]" *Roebuck v. State*, 277 Ga. 200, 205 (5) (586 SE2d 651) (2003). We find no error.

10. In reliance on *Carr v. State*, 267 Ga. 701 (1) (482 SE2d 314) (1997), overruled on other grounds in *Clark v. State*, 271 Ga. 6 (5) (515 SE2d 155) (1999), Al-Amin asserts that the trial court erred in admitting evidence that he was tracked by dogs when he was arrested in Alabama because there was no scientific evidence shown of the reliability of the evidence.

In *Carr*, supra, we held that evidence of the use of a dog trained to alert to the presence of accelerants is not admissible in the absence of a showing that the evidence has reached the "state of verifiable certainty" required by *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982). The *Harper* requirement was imposed in *Carr*, supra, because the testimony concerning the dog alert was offered as substantive evidence of the presence of accelerants, and thus bore directly on the guilt of the accused on arson and murder charges. Because that type of expert testimony is not one that the average layperson could determine for himself, we held that the analysis and data gathering leading to the testimony should have been subject to the requirements of scientific verifiability required under *Harper*, supra. *Carr*, supra at 703.

Unlike *Carr*, the issue now before the Court turns on "testimony regarding use of dogs to flush defendant out of a wooded area. . . . [It] was not germane to the question of whether defendant committed the crimes charged . . . [but] was relevant only to prove the manner in which law enforcement officers apprehended [the] suspect." *Ingram v. State*, 211 Ga. App. 821 (1) (441 SE2d 74) (1994). Because this is evidence which is within the ken of the average layperson, it was not necessary that the *Harper* standards be met. *Carr*, supra at 703.

11. Nor did the court err in refusing to conduct a *Harper* hearing regarding the admissibility of firearms/ballistic/tool marks evidence. "Once a procedure has been recognized in a substantial number of

courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." *Harper*, supra at 526 (1). The ballistics evidence was introduced through the testimony of a properly qualified expert. Such ballistics evidence "is not novel, and has been widely accepted in Georgia courts." *Whatley v. State*, 270 Ga. 296, 299 (6) (509 SE2d 45) (1998).[8] It follows that the trial court was authorized to accept the expert's testimony and that a *Harper* hearing was not required.

12. It is asserted that FBI Special Agent Campbell, who was part of the federal task force which apprehended Al-Amin, gave substantially misleading testimony at the behest of the prosecution, in violation of defendant's due process rights. The undisputed evidence showed that after Al-Amin had been arrested and handcuffed, Campbell spit at him and kicked him. At trial, the prosecutor elicited testimony from Campbell on direct examination that he had been "suspended pending dismissal" for that conduct and that the FBI "intends" to fire him. Al-Amin asserts that this testimony was substantially misleading because Campbell was later to receive only a 60-day suspension for his misconduct.

" 'Conviction of a crime following a trial in which perjured testimony on a material point is knowingly used by the prosecution is an infringement on the accused's Fifth and Fourteenth Amendment rights to due process of law.' [Cit.]" *Gates v. State*, 252 Ga. App. 20, 21 (1) (555 SE2d 494) (2001). See also *Napue v. Illinois*, 360 U. S. 264 (79 SC 1173, 3 LE2d 1217) (1959). Despite Al-Amin's protestations to the contrary, we are not persuaded that the testimony in issue was material to the issues on trial. But even if it could be said that testimony that the FBI intended to fire Campbell was material, it was

---

[8] Such evidence has also been widely accepted in other jurisdictions. In *United States v. Foster*, 300 FSupp2d 375, n. 1 (D. Md. 2004), the court observed that

[b]allistics evidence has been accepted in criminal cases for many years. The first comprehensive textbook of ballistics, Firearms Investigation, Identification and Evidence, was published by Major Julian S. Hatcher in 1935. . . . [N]umerous cases have confirmed the reliability of ballistics identification. See, e.g., *United States v. Santiago*, 199 FSupp2d 101, 111 (SDNY 2002) ("The Court has not found a single case in this Circuit that would suggest that the entire field of ballistics identification is unreliable. . . . To the extent that [the defendant] asserts that the entire field of ballistics identification is unacceptable 'pseudo-science,' the Court disagrees."); *United States v. Cooper*, 91 FSupp2d 79, 82-83 (DDC 2000) (implying that ballistics identification involves "well-established" scientific principles); *United States v. Davis*, 103 F3d 660, 672 (8th Cir. 1996) (upholding the use of expert testimony to link bullets recovered from a crime scene to a firearm associated with the defendant); cf. *United States v. Scheffer*, 523 U. S. 303, 313-314 (118 SC 1261, 140 LE2d 413) (1998) (contrasting polygraph evidence with other more accepted fields of expert testimony, including ballistics).

established at the hearing on the motion for new trial that the FBI did not make a final decision as to what penalty would be imposed until after the conclusion of trial. Consequently, Al-Amin failed to show the knowing use of perjured testimony by the prosecution. *Gates*, supra.

13. Al-Amin also contends that the State violated his rights under *Brady v. Maryland*[9] and Georgia discovery statutes by failing to produce FBI records relating to the internal investigation of Special Agent Campbell. These documents were sought to support the defense theory that Campbell planted evidence to incriminate Al-Amin.

In response to a defense subpoena, the FBI turned over to the trial court certain documents relating to their investigation of Campbell. During trial, the court examined the documents in camera, disclosed to Al-Amin all relevant portions, and sealed what the court deemed irrelevant. The court did so under the Georgia discovery statute, and on general grounds of fairness, noting that the material would not necessarily have been subject to *Brady*. Al-Amin had the opportunity to cross-examine Campbell as well as other federal agents regarding Campbell's conduct and the subsequent investigation.

This issue was revisited during the hearing on the motion for new trial, at which time the trial court reviewed in camera and turned over to the defense all the documents produced by the FBI in response to Al-Amin's post-trial request. The court noted that these documents were entirely consistent with Campbell's trial testimony. Al-Amin conjectures that the FBI failed to produce every document in its possession pertaining to the Campbell investigation, and that somehow the State is under a duty to remedy the alleged omission. Even assuming arguendo that all relevant documents in the possession of the FBI were not produced, "a state criminal defendant, aggrieved by the response of a federal law enforcement agency made under its regulations, may assert his constitutional claim to the investigative information before the district court, which possesses authority under the [Administrative Procedure Act][10] to compel the law enforcement agency to produce the requested information in appropriate cases." *United States v. Williams*, 170 F3d 431, 434 (4th Cir. 1999). Thus, the remedy lies in federal court.

With regard to the material produced by the FBI but which the trial court deemed irrelevant and refused to disclose to the defense, we perceive no *Brady* violation or error under Georgia law.

---

[9] 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).
[10] See 5 USC §§ 701-706.

14. Al-Amin contends that the trial court improperly restricted cross-examination of Special Agent Campbell regarding his shooting of another suspect in an unrelated case in Philadelphia in 1995.

Specific instances of prior misconduct may not be used to impeach the character or veracity of a witness "unless the misconduct has resulted in the conviction of a crime involving moral turpitude." (Punctuation omitted.) *Allen v. State*, 275 Ga. 64, 68 (3) (561 SE2d 397) (2002). See also OCGA § 24-9-84. In *Pruitt v. State*, 270 Ga. 745 (21) (514 SE2d 639) (1999), under very similar circumstances, the defense sought to cross-examine the State's chief police investigator concerning his misconduct in an unrelated matter when he allowed a DUI suspect to avoid arrest and prosecution as a favor to another officer. The defense claimed that the evidence was relevant to show that the investigator may have tampered with evidence in Pruitt's murder prosecution. The trial court disallowed questioning about the prior incident. We affirmed that ruling, holding that "the DUI case was wholly unrelated to Pruitt's case; questioning about this incident was obviously and solely intended to diminish [the officer's] credibility as a witness. [The officer] was not convicted of any crime in the DUI incident, and impeaching a witness with specific acts of bad character is not permissible." Id. at 754.

In the case now before the Court, the trial court excluded evidence of the 1995 incident on the basis that Campbell had not been prosecuted for the alleged misconduct, and that any probative value was far outweighed by the danger of unfair prejudice. "While a defendant is entitled to effective cross-examination, he is not entitled to unfettered cross-examination, and the trial court has broad discretion in limiting its scope." *Allen*, supra at 68. We find no abuse of that discretion for any of the reasons advanced.

15. It is asserted that during closing argument the prosecutor impermissibly commented on the failure of Al-Amin to testify, in violation of his Fifth Amendment right against self-incrimination, and the concomitant statutory right contained in OCGA § 24-9-20 (b). We agree, but we find that the error, although of a constitutional magnitude, was harmless beyond a reasonable doubt.

During closing argument, the prosecutor told the jury, "I want to leave you with a few questions you should have for the defendant." He then displayed a chart which contained a series of seven "questions for the defendant." In addressing those questions, the prosecutor argued, inter alia, "Mr. defendant, how did those murder weapons get there to Whitehall? . . . . How did your Mercedes get to Whitehall? . . . . Did you drive it there?" At that point, the defense moved for a mistrial, asserting that the argument violated Al-Amin's right to remain silent under both federal and Georgia law. The trial court denied the motion and invited the defense to propose a curative instruction; it declined

to do so. The prosecutor then altered the caption on the chart to state, "questions for the defense," and he continued with his closing. The defense renewed its motion for mistrial, which was again denied. The defense then requested a curative instruction from the court. In response, the court instructed the jury that closing argument is not evidence; that a criminal defendant is under no duty to present evidence and is not required to testify; that no adverse inference should be drawn if a defendant elects to remain silent; that the burden always remains on the State to prove guilt beyond a reasonable doubt; and the prosecution may not comment on the failure of the defendant to testify.[11] A renewed motion for mistrial was denied. The prosecutor continued its argument, reiterating that the defendant is not obligated to present evidence; and that burden rests at all times with the State.

> As a rule of both constitutional law and Georgia statutory law, a prosecutor may not make any comment upon a criminal defendant's failure to testify at trial. *Griffin v. California*, 380 U. S. 609, 615 (85 SC 1229, 14 LE2d 106) (1965); OCGA § 24-9-20 (b). This rule ensures that the State does not impose "a penalty" for or make "costly" the exercise of the constitutional right to remain silent. 380 U. S. at 614.

*Raheem v. State*, 275 Ga. 87, 92 (7) (560 SE2d 680) (2002). Here, Al-Amin's constitutional and statutory rights were violated when the prosecutor in effect engaged in a mock cross-examination of the accused who had invoked his right to remain silent.

> Improper reference to a defendant's silence, however, does not automatically require reversal. [Cits.] Assuming that a defendant has preserved the point by proper objection, the error may be harmless beyond a reasonable doubt. [Cits.] The determination of harmless error must be made on a case by case basis, taking into consideration the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt.

*Hill v. State*, 250 Ga. 277, 283 (4) (295 SE2d 518) (1982). See also *Chapman v. California*, 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967). Al-Amin's guilt was overwhelmingly established through the eyewitness identification by Deputies Kinchen and English, as well

---

[11] These instructions were repeated in the final charge to the jury.

as by the vast amount of physical evidence tying defendant to the crimes. The jury was promptly given a lengthy instruction setting forth the correct principles of law. Compare *Salisbury v. State*, 221 Ga. 718 (5) (146 SE2d 776) (1966) and *Spann v. State*, 126 Ga. App. 370 (2) (190 SE2d 924) (1972) (the error was deemed harmful in the absence of any effort by the trial court to correct the injury the improper remark caused the defendant). The strength of the evidence against Al-Amin coupled with the contemporaneous curative instruction leads this Court to conclude that the violation here was harmless beyond a reasonable doubt. *Chapman v. California*, supra; *Raheem*, supra at 92 (7); *Hill*, supra at 283 (4).

16. Al-Amin challenges the prosecutor's closing argument in other respects.

(a) It is asserted that the prosecutor misstated the testimony given by a State's witness. What is impermissible is "the injection into the argument of extrinsic and prejudicial matters which have no basis in the evidence." (Punctuation omitted.) *Bell v. State*, 263 Ga. 776, 777 (439 SE2d 480) (1994). Here the prosecutor imprecisely restated the description given by Deputy Kinchen of his assailant to one of the EMTs on the scene. The EMT testified that Deputy Kinchen told him that he and his partner were in the process of serving a warrant "when the suspect opened up on us." The prosecutor misstated the EMT's testimony by recounting that Deputy Kinchen identified his assailant as "the guy on the warrant." Upon objection by the defense, the trial court instructed the jury that the attorneys in good faith are recalling the evidence, but closing arguments are not evidence and in the end the evidence is what the jury determines it to be. We find no error.

(b) Al-Amin asserts that he was entitled to a mistrial when at the conclusion of the State's closing argument, the prosecutor stated, "don't stand for him," alluding to Al-Amin's religious beliefs which prevented him from rising when the jury entered the courtroom. The record reveals that several times during trial, the court offered to instruct the jury that as an observant Muslim, Al-Amin is prevented by his religious beliefs from standing in the courtroom. On each occasion, the defense declined. The defense ultimately accepted the court's offer to explain this conduct during the jury charge at which time the jury was instructed that the defendant is a practicing Muslim, that he has elected not to stand because of his religious beliefs, and that his conduct has the court's approval. Al-Amin was not harmed by the prosecutor's comments.

(c) Although it is asserted that the cumulative effect of the errors in closing argument deprived defendant of a fair trial, Georgia does not follow a cumulative error rule of prejudice. *Morrison v. State*, 276 Ga. 829 (5) (583 SE2d 873) (2003).

(d) Any remaining assertions of error with respect to the State's closing argument were not preserved for review. See *Mullins v. State*, 270 Ga. 450 (2) (511 SE2d 165) (1999).

17. During cross-examination of a State's witness, defense counsel elicited testimony that the witness had grown up in the West End community; counsel then asked the witness if he had seen how the neighborhood had changed. Anticipating that the questioning was leading to Al-Amin's role in community improvement, the State requested a bench conference and asked the trial court for a ruling as to whether such evidence would open the "character door." The defense objected but discontinued that line of questioning. After further argument on the issue, the court ruled that testimony concerning Al-Amin's positive influence in the community would constitute evidence of good character under *State v. Braddy*, 254 Ga. 366 (330 SE2d 338) (1985), and would permit the State to offer rebuttal evidence. On appeal, Al-Amin asserts that the court erred in its ruling, and that the error was amplified when the State introduced evidence that the reaction of the community to the crime was "unusual" in that no onlookers were present when the police arrived at the scene of the crime, thus *implying* that local witnesses feared the defendant.

"[W]here the defendant offers testimony of a witness as to his general good reputation in the community, the State may prove the defendant's general bad reputation in the community, and may additionally offer evidence that the defendant has been convicted of prior offenses under the authority of OCGA § 24-9-20 (b)." *Jones v. State*, 257 Ga. 753, 758 (1) (363 SE2d 529) (1988). "[I]t is possible for a criminal defendant to put his character in issue while cross-examining a [S]tate's witness." *Franklin v. State*, 251 Ga. 77, 81 (2) (303 SE2d 22) (1983).

In *Braddy*, supra at 366-367, this Court addressed the question of whether evidence of a defendant's impact on the community constituted character evidence:

> The character of a defendant in most criminal cases is a substantive issue. [Cit.] A party *can* establish character by showing the community's perception of the defendant — his reputation, things the defendant has done — specific acts, and what a witness thinks personally about the defendant. The rules of evidence determine, by attempting to balance the truth seeking function with the interest of fairness, which method a party *may* use to establish character in a given situation. See 1A Wigmore, Evidence § 52, at 1148. (Tillers Revision, 1983).

Based on the foregoing, the trial court correctly determined that if the defense had pursued its questioning of the witness concerning Al-Amin's positive contributions to the West End community, the defense would have made "an election to place his good character in issue." *Jones,* supra at 758.

Evidence as to the reaction of the community merely described the crime scene and results of the investigation, both of which were relevant and admissible. See generally *Corza v. State,* 273 Ga. 164 (2) (539 SE2d 149) (2000) (State is entitled to present evidence of the entire res gestae of a crime; this is so even if the defendant's character is incidentally placed in issue). Al-Amin has not established that the trial court abused its discretion in admitting the evidence.

18. When Al-Amin was arrested, he was approached by an FBI agent who identified himself as a medic and asked him if he was injured. Al-Amin responded that he was "out of breath." He now contends that the court erred in admitting this statement because it was given without *Miranda* warnings, and it was not revealed to the defense prior to trial as required by the Georgia discovery statute, codified at OCGA § 17-16-4 (a) (1).

The trial court determined that the question was asked for the sole purpose of assessing whether the suspect required medical aid, and was unrelated to the police investigation. The court then admitted the testimony only as it relates to a physical assessment of the suspect, and prohibited the State from drawing any inferences from it.

(a) *Miranda* warnings are required "not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis,* 446 U. S. 291, 300 (100 SC 1682, 64 LE2d 297) (1980). In this context, the term "interrogation" refers not just to express questioning, but also to questioning that the police should know is "reasonably likely to elicit an incriminating response from the suspect." Id. at 301; *Lucas v. State,* 273 Ga. 88 (2) (538 SE2d 44) (2000). Unless the police know that the suspect is susceptible to questions concerning his health, or unless the suspect's health is somehow related to a crime that the police believe he committed, it is unlikely that questions concerning the suspect's physical health would elicit an incriminating response. See *United States v. Robles,* 53 M. J. 783, 790 (II) (b) (2000) (holding that under the *Innis* definition of interrogation, inquiring about a suspect's health is not the functional equivalent of questioning). See also *Colon v. State,* 256 Ga. App. 505 (1) (568 SE2d 811) (2002) (police officers have the responsibility to ask medical questions as part of routine booking in order to fulfill the government's obligation to

provide medical treatment to one in custody, and such routine booking questions are generally considered exempt from *Miranda*). Because the question posed by the medic related only to Al-Amin's physical condition and was not likely to elicit an incriminating response, *Miranda* warnings were not required. *Innis,* supra, 446 U. S. at 300; *Colon,* supra at 505 (1).

(b) Even assuming arguendo that OCGA § 17-16-4 (a) (1) requires pretrial disclosure of the statement, Al-Amin has not shown that he was prejudiced by the lack of pretrial disclosure, or that the State acted in bad faith. Under the circumstances, the State was not prohibited from introducing the statement into evidence. OCGA § 17-16-6; *Simmons v. State,* 271 Ga. 563 (3) (522 SE2d 451) (1999); *Felder v. State,* 270 Ga. 641 (6) (514 SE2d 416) (1999).

19. Al-Amin contends that the court erred in excluding on hearsay grounds the statements of two individuals who spoke to police investigators on the night of the shootings, and who were unavailable to testify.

The first was a statement given to an investigating officer by an elderly neighbor who said she heard gunfire at about 10:00 p.m. (the time established that the deputies were shot), and that five to ten minutes later, she heard a vehicle drive away at a high rate of speed. The neighbor was not able to testify due to ill health, and the defense sought to introduce her statements through the investigating officer under the necessity exception to the hearsay rule. OCGA § 24-3-1 (b).

The second was an unknown declarant who told an officer on the night of the shooting that "someone just ran through here, but don't tell anybody I told you this"; the officer did not note the name of the individual. Al-Amin argued that this statement was admissible under the necessity exception, or alternatively, as an excited utterance as part of the res gestae exception to the rule against hearsay. OCGA § 24-3-3.

Neither of the statements were admissible under the necessity exception.[12]

> In order to introduce any hearsay statement under the necessity exception, (1) the declarant must be unavailable to testify; (2) there must be particularized guarantees of the statement's trustworthiness; and (3) the statement must be both relevant to a material fact and more probative regarding that fact than any other evidence concerning appellant's

---

[12] Because the Sixth Amendment's Confrontation Clause is not implicated where the proponent of the hearsay is the defendant, the recent decision of the United States Supreme Court in *Crawford v. Washington,* 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004) is inapplicable here.

motive for the crimes. . . . Merely because [the declarant] made his statement to police within hours of the shooting and never recanted or contradicted his statement does not, standing alone, demonstrate that the statement was sufficiently trustworthy to warrant its admission under the necessity exception. Only where "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility" does the hearsay rule not bar admission of a hearsay statement at trial.

*Phillips v. State*, 275 Ga. 595, 597 (4) (571 SE2d 361) (2002). The same rule applies when a defendant is the proponent of the hearsay. *Turner v. State*, 267 Ga. 149 (3) (476 SE2d 252) (1996).

The trial court correctly determined that with respect to the statement of the neighbor, the defense failed to carry its burden of demonstrating particularized guarantees of trustworthiness. *Phillips*, supra at 597 (4). In addition, the evidence would have been cumulative of the testimony given by several witnesses that gunfire was heard at 10:00 p.m., and a vehicle (dissimilar to Al-Amin's) was seen driving away from the scene several minutes later. Thus, the excluded evidence was not more probative of the fact for which it was offered than other properly admitted evidence. Id.

Likewise, there was absolutely no showing of reliability with respect to the statement of the anonymous declarant. Nor did the anonymous statement qualify as an excited utterance. To be admissible as an excited utterance, the proponent of the hearsay must show that the event precipitating the statement was "sufficiently startling to render inoperative the declarant's normal reflective thought processes, and the declarant's statement must have been the result of a spontaneous reaction." *Walthour v. State*, 269 Ga. 396, 397 (2) (497 SE2d 799) (1998). See also *Lindsey v. State*, 271 Ga. 657 (2) (522 SE2d 459) (1999). Al-Amin failed to meet this burden.

The trial court correctly determined that the hearsay statements were not admissible for the reasons advanced.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 24, 2004 —
RECONSIDERATION DENIED JUNE 28, 2004.

*John R. Martin, Garland, Samuel & Loeb, Donald F. Samuel, William C. Lea*, for appellant.

*Paul L. Howard, Jr., District Attorney, Anne E. Green, Assistant District Attorney, Thurbert E. Baker, Attorney General, Ruth M. Pawlak, Assistant Attorney General*, for appellee.