**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS, P. J. and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**February 19, 2013**

# In the Court of Appeals of Georgia

A12A2397. RODRIGUEZ v. THE STATE. DO-091 C

DOYLE, Presiding Judge.

Sonia Rodriguez was indicted with possession of marijuana with intent to distribute.[1] In this interlocutory appeal, Rodriguez challenges the denial of her motion to suppress alleged marijuana found by police during a vehicle stop using an automated license plate scanning system.[2] She contends that the trial court erred because (1) the officer lacked a sufficient basis for initiating the stop, and (2) the

---

[1] OCGA § 16-13-30 (j).

[2] We note that another recently decided case, *Hernandez-Lopez v. State*, __ Ga. App. __ (Case No. A12A1715; decided Feb. 5, 2013), addressed a similar challenge to the automated system.

officer unreasonably prolonged the detention after making the initial stop. For the reasons that follow, we affirm.

> While the trial court's findings as to disputed facts in a ruling on a motion to suppress will be reviewed to determine whether the ruling was clearly erroneous, where the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review.[3]

Here, the relevant facts are undisputed, and the record from the suppression hearing shows that an officer was on duty in a marked police cruiser monitoring automobile traffic with an automatic license plate scanning system. The officer was parked on a public roadway so that the plate scanning system photographed license plates on each vehicle passing within 15 feet on either side of his vehicle. The computerized system then automatically checked each license plate against a database containing a list of license plates associated with stolen vehicles or people subject to an active warrant. If a plate on the list is identified by the system, a message is immediately sent to the officer in his vehicle alerting him of the identified vehicle.

---

[3] (Citation omitted.) *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

On the day in question, the plate recognition system alerted the officer that a vehicle had passed which was associated with Enrique Sanchez, who was subject to a failure to appear warrant.[4] The alert identified the license plate, make, model, and color of the vehicle. After receiving the alert, the officer turned his vehicle around and began pursuit of the vehicle to execute a stop. At that time, he also alerted dispatch as to his pursuit.[5]

Shortly thereafter, the officer pulled over the identified vehicle and made contact with the driver, Rodriguez, who had a female passenger in the front seat. The officer requested Rodriguez's driver's license, which she provided, and explained that he had stopped the vehicle because it was associated with Sanchez, who was subject to an active warrant. Rodriguez explained that Sanchez was her son, and he had failed to appear to answer a traffic citation because he had been imprisoned before the hearing. The officer noticed a strong odor of air fresheners while he spoke to Rodriguez. The officer also asked Rodriguez who her passenger was, and Rodriguez

---

[4] The officer initially testified that the tag was registered to Sanchez, but later clarified that the system identified the vehicle as driven by (but not necessarily registered to) Sanchez when he incurred the citations for which he failed to appear. For that reason, Sanchez was associated with the vehicle in the database.

[5] There is no evidence of any evasion or flight by the pursued vehicle.

identified her as a friend, whom the officer asked for identification. The friend, Ereka Williams, supplied her name and birth date, but did not have any identification on her. The officer asked the women if there was any contraband in the vehicle, and they replied "no."

The officer then returned to his patrol vehicle and ran a Georgia Crime Information Center ("GCIC") check on their names to determine Rodriguez's license status and to check for warrants. As the check proceeded, a backup officer arrived, and Williams's name was identified as having an active warrant in Florida, and her driver's license had been suspended for a controlled substance violation. Approximately four minutes had elapsed from the time the officer initiated the stop. The officers decided to speak further to Williams and Rodriguez while they waited "a couple of minutes" on information from dispatch as to whether Florida would extradite Williams for the warrant.

While the backup officer spoke to Rodriguez outside of her vehicle, the first officer spoke to Williams about her warrant and obtained her consent to search her purse, which was still in the vehicle. As the women waited outside of the vehicle at the officers' request, the first officer leaned into the vehicle to retrieve Williams's purse and smelled what he called "a minor odor of raw marijuana . . . inside the

4

vehicle." At the same time, the backup officer had obtained consent to search the vehicle. In the course of the vehicle search, the officers found suspected marijuana that formed the basis of the arrest and indictment in this case.[6]

1. Rodriguez contends that the license plate recognition system used by the officer did not provide an adequate basis for the vehicle stop. Specifically, she points out that the arresting officer gave a general description as to how the system works, including that it checks license plates against a GBI database that is updated daily, but the State offered no evidence as to the specifics of how warrants are entered into the system, how they are removed, and how the database accuracy is verified. Therefore, she argues that the State failed to provide the proper foundation as to its reliability under *Harper v. State*.[7]

This argument presents no basis for reversal. *Harper* addressed the admissibility of defense expert testimony about the results of an interview a psychiatrist conducted with the defendant while the defendant was under the

---

[6] Suspected marijuana was also found in Williams's purse.

[7] 249 Ga. 519 (292 SE2d 389) (1982).

5

influence of a "truth serum," sodium amytal.[8] In affirming the trial court's exclusion of this evidence, the Georgia Supreme Court held that the proper test for determining the admissibility of such evidence at trial was to "decide whether the procedure or technique in question has reached a scientific stage of verifiable certainty, [i.e.,] . . . whether the procedure 'rests upon the laws of nature.'"[9] Thus, *Harper* established the test for the admissibility at trial of expert testimony regarding novel[10] scientific evidence as to innocence or guilt. The Georgia Supreme Court has explained the scope of *Harper* as applicable to expert testimony that is substantive evidence of guilt and that is of a type that "is not one that the average layperson could determine for himself . . . ."[11]

---

[8] The defendant denied committing the crime during the interview. See id. at 523-524 (1).

[9] Id. at 525 (1).

[10] "Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." Id.

[11] *Al-Amin v. State*, 278 Ga. 74, 81 (10) (597 SE2d 332) (2004).

6

By contrast, the database evidence here is not offered as evidence of guilt;[12] instead, it was offered at the suppression hearing to demonstrate "specific and articulable facts that provide a reasonable suspicion that the individual being stopped is engaged in criminal activity"[13] or that "the driver or vehicle is otherwise subject to seizure for violation of the law."[14] In that context, Georgia courts have not required the foundational protocols of *Harper* to verify each data point of the facts articulated to provide a reasonable suspicion. For example, "[o]fficers are entitled to rely on information provided by other officers or by their dispatcher when asked to be on the lookout for a certain vehicle or suspects [, and t]here is no requirement that the officer or officers providing the information testify at the motion to suppress."[15] We have

---

[12] Cf. id. (the challenged testimony "was not germane to the question of whether defendant committed the crimes charged but was relevant only to prove the manner in which law enforcement officers apprehended the suspect.") (punctuation omitted.) See also *Ingram v. State*, 211 Ga. App. 821 (1) (441 SE2d 74) (1994) (no foundation was required for evidence as to the reliability or training of tracking dogs because the tracking evidence was not used to establish guilt but merely to prove the manner in which police apprehended the defendant.)

[13] *Jones v. State*, 291 Ga. 35, 38 (2) (727 SE2d 456) (2012).

[14] *Humphreys v. State*, 304 Ga. App. 365, 366 (696 SE2d 400) (2010).

[15] (Citation omitted.) *Edmond v. State*, 297 Ga. App. 238, 239 (676 SE2d 877) (2009).

also affirmed a vehicle stop made after a random check of license plates returned information through the GCIC that indicated the vehicle's owner had a suspended driver's license.[16] Also, even when an officer incorrectly recited a license plate number to dispatch, we held that he could rely on information relayed from dispatch as to a database report that the license belonged on another vehicle. In so holding, we explained that

> [w]e do not fault the State for not proving that the radio equipment used by the officer in the communications was in good working order and for not proving that there was an adequate protocol established and followed with respect to assuring accuracy of information conveyed. This would introduce, without authority or rationale, a new burden into the determination of whether a [traffic] stop is based on articulable suspicion [as required by *Terry v. Ohio*[17]]. To the contrary, *McDaniel v. State*[18] found reasonable a *Terry* stop based on a revoked "be-on-the-lookout" dispatch even though the police officer who stopped the vehicle did not verify the dispatch or assure its accuracy and thus did not find out that it had been withdrawn. . . . In forming an

---

[16] *Humphreys*, 304 Ga. App. at 366-367. See also *Hernandez-Lopez*, __ Ga. App. at __ (1).

[17] 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

[18] 227 Ga. App. 364, 366 (2) (489 SE2d 112) (1997).

8

articulable suspicion, an officer is entitled to rely on the information given him by a fellow officer.[19]

Likewise, although the information in this case was automatically relayed to the officer by a computer, we decline to impose an additional burden on the State to demonstrate in a particularized way the reliability of the database and alert protocol used in this case.[20]

---

[19] (Punctuation omitted.) *Cunningham v. State*, 231 Ga. App. 420, 421 (1) (498 SE2d 590) (1998). See generally *United States v. Wilcox*, 415 Fed. Appx. 990, 992 (II) (11th Cir. 2011) (unpublished per curiam opinion) ("The Supreme Court has concluded in similar contexts that visual surveillance of vehicles in plain view does not constitute an unreasonable search for Fourth Amendment purposes. See, e.g., *New York v. Class*, 475 U. S. 106, 114 (106 SC 960, 89 LE2d 81) (1986) (involving inspection of vehicle identification number ordinarily visible from outside vehicle, but which was obscured from plain view by papers). This is true even if the surveillance is aided by the use of technology to augment the officers' sensory faculties. See *United States v. Knotts*, 460 U. S. 276, 282 (103 SC 1081, 75 LE2d 55) (1983) (involving use of radio transmitter on container carried in car under visual surveillance to help track transport).

[20] In so holding, we note the limited use of the database information in this case, i.e., to demonstrate an officer's authority to stop a vehicle during a hearing on a motion to suppress. We are not presented with the question of the admissibility of the database information for use at trial to show guilt of the charged offense. Compare *Izer v. State*, 236 Ga. App. 282, 284 (511 SE2d 625) (1999) (holding that evidence from a laser-based speed detection device was inadmissible at trial as substantive evidence of a speeding offense because the evidence had not reached a scientific stage of verifiable certainty under the *Harper* standard), superceded by OCGA § 40-14-17.

We note that *Duke v. State*,[21] cited by Rodriguez does not require a different outcome. In *Duke*, a Walton County Sheriff deputy stopped a vehicle based on a radio communication from a 911 center informing him that a Mazda RX-7, with a specific license number was sought by the Loganville Police Department "for suspicion of drug activity."[22] In that case, the State failed to provide any facts known to the Loganville officers that justified their suspicion of drug activity. Therefore, the Court found no basis to conclude "that the stop was justified by a reasonable suspicion of criminal activity."[23] That outcome was correct because otherwise police could avoid the requirement of particularized suspicion by merely relaying any generalized hunch over the radio. Here, by contrast, the State did provide the particularized factual basis for suspicion: that the GCIC had returned information linking Sanchez, a person who was the subject of an active arrest warrant, to Rodriguez's vehicle. Knowing that fact, the officer had a reasonable suspicion that Sanchez could be found driving or riding in the vehicle, and thus, the officer was authorized to initiate a stop of the vehicle.

---

[21] 257 Ga. App. 609 (571 SE2d 414) (2002).

[22] Id.

[23] Id. at 610.

10

2. Rodriguez also contends that once the officer determined that the occupants of the vehicle were female (and therefore not the male subject of the warrant) the officer's authority to stop or further detain Rodriguez ended. This argument presents no ground for reversal based on the record before us.

The record is somewhat imprecise as to the exact moment that the officer determined that the occupants of the vehicle were female and therefore could not be the subjects of the warrant associated with the vehicle. But the trial court appeared to construe the officer's testimony to find that the officer discovered Rodriguez's gender only upon making initial face-to-face contact at the roadside. The officer's description of the encounter supports this finding, so we base our analysis on that scenario.[24]

Based on Division 1, the officer had authority to initiate the stop of Rodriguez's vehicle and make verbal contact with her.[25] Having initiated a valid stop, the officer was entitled to request her license and even request her to exit the vehicle:

> An officer conducting a routine traffic stop may request and examine a
> driver's license and vehicle registration and run a computer check on the

---

[24] See *Vansant*, 264 Ga. at 320 (1).

[25] Rodriguez presents no other argument requiring reversal as to that point.

11

documents. It does not unreasonably expand the scope or duration of a valid traffic stop for an officer to prolong the stop to immediately investigate and determine if the driver is entitled to continue to operate the vehicle by checking the status of the driver's license, insurance, and vehicle registration.[26]

Further,

the police may lawfully ask questions *unrelated to the purpose of a valid traffic stop*, so long as the questioning does not unreasonably prolong the detention. A reasonable time includes the time necessary to verify the driver's license, insurance, registration, and to complete any paperwork connected with the citation or written warning.[27] A reasonable time also includes the time necessary to run a computer check to *determine whether there are any outstanding arrest warrants for the driver or the passengers*.[28]

---

[26] (Citation and punctuation omitted.) *Salmeron v. State*, 280 Ga. 735, 737 (1) (632 SE2d 645) (2006).

[27] We note that no written citation or warning was given here.

[28] (Citation and punctuation omitted; emphasis supplied and in original.) *Matthews v. State*, 294 Ga. App. 836, 838 (1) (670 SE2d 520) (2008) (whole court). See also *Rocha v. State*, 317 Ga. App. 863, 867 (1) (733 SE2d 38) (2012) (same).

Indeed, it is worth noting that verifying the validity of a driver's license will, alone, almost never be a valid *initial* purpose of a traffic or investigatory stop.[29] But our courts routinely have allowed officers to verify a driver's licensing status or check for warrants, once the driver has been stopped for a valid reason.[30]

Here, the record shows that Williams's Florida warrant was discovered during the time it took to check Rodriguez's license and check for outstanding warrants, and the officers' request for consent to search the vehicle and Williams's purse (and the first officer's observation of the raw odor of marijuana) occurred during the follow up conversation with Williams and Rodriguez while the officers waited to learn from dispatch about the extradition status of Williams.[31] The entire process up to the time

[29] See *Delaware v. Prouse*, 440 U. S. 648, 663 (VII) (99 SC 1391, 59 LE2d 660) (1979) ("[E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.").

[30] See, e.g., *Rocha*, 317 Ga. App. at 867 (1); *Matthews*, 294 Ga. App. at 838 (2).

[31] Compare *State v. Jones*, 252 Ga. App. 404, 406 (1) (556 SE2d 495) (2001) (affirming the grant of a motion to suppress because "the officer continued to detain [the defendant] and question him about matters unrelated to the reason for the initial stop *after* he had completed the routine license and vehicle registration check") (emphasis supplied).

13

the consent to search was given took approximately six to ten minutes. Under these facts, the trial court correctly ruled that the officers did not unreasonably expand the scope or duration of the initial stop.[32] Accordingly, we discern no error in denying the motion to suppress.

*Judgment affirmed. Andrews, P.J. and Boggs, J., concur.*

---

[32] See *Rocha*, 317 Ga. App. at 866 (1) ("If a driver is questioned and gives consent while he is being lawfully detained during a traffic stop, there is no Fourth Amendment violation.").