## A07A1519. BASS v. THE STATE.

(655 SE2d 303)

MIKELL, Judge.

A jury convicted Ronald Bass of 24 counts, including robbery, simple battery, and numerous property crimes, all of which concerned individuals who had participated in procuring a court order for the removal of 12 dogs from his residential property. The trial court sentenced him to a total of 40 years to serve. Following the denial of his amended motion for new trial, Bass appeals, raising several enumerations of error, including that the state failed to prove venue and that the trial court erred in rejecting his ineffective assistance of counsel claim. Finding no basis for reversal, we affirm.

Viewed in the light most favorable to the verdict, the evidence shows that Bass and his family moved from Chicago, Illinois, to Cuthbert, Georgia, in 1993 and soon began housing stray dogs on their residential property. By the spring of 1997, the dogs numbered about 15, and Bass's neighbors had become annoyed by what they considered excessive barking and noxious odors coming from Bass's property. In April of that year, Jane Miller, who lived in Atlanta with her husband and whose children and grandchild owned a house next door to Bass, mailed Bass a letter complaining about the dog situation and asking him to remedy it. Miller received no reply to that letter nor to a follow-up letter; therefore, she and her husband called Bass about the matter. During their telephone conversation, Bass became hostile, advised the Millers that what was going on in Cuthbert was none of their business, and recommended to Miller's husband, "You should keep better control of your wife. If she wants a cause she should stay in Atlanta and clean up the Chattahoochee River."

In May, Miller went to Bass's home and hand-delivered to him another letter, again complaining about the dogs and imploring him to reduce their number to three or less. This letter was signed by Miller and others, including the following property owners in Bass's neighborhood: William Miller (who was Jane Miller's son and part owner of the property); Anne Moshell; Martha Riley; Dan Harris and his wife, Sheryl Harris; and Floyd Goff. During their encounter that day, Bass said to Miller:

> [D]id you find out — from anybody in town that I was born and raised in Chicago? I'm a Yankee. . . . And the last time a Yankee came down to Georgia and tore up, he did a pretty darn good job of it. Up in Atlanta you might remember, he was called William T. Sherman.

Miller left, considering Bass's words a threat.

Later that month, a petition to abate a private nuisance was filed in municipal court, complaining of incessant noise and intolerable odor caused by Bass's 15 dogs. The petition was signed by Jane and William Miller, Moshell, Riley, the Harrises, Goff, and others. At a hearing thereon, at which Bass was present, there was testimony in support of the petition by Jane and William Miller, Moshell, Riley, Dan Harris, and Goff. The municipal court thereafter ruled that Bass was maintaining a nuisance upon his property by housing 15 dogs and ordered him to remove 12 of them by September 30, 1997, or subject himself to contempt sanctions. The order was issued on July 25, 1997, and Bass filed a notice of appeal to the superior court.

Within days of the municipal court order, a rash of fires began that destroyed all the buildings on the property owned by Miller's relatives. In July, their house burned; in August, their barn-type storage shed burned; and in September, their garage burned. Thereafter, twice in October and again in November, trees growing on their property were cut down without their permission.

An arson investigator with the Georgia State Fire Marshal's Arson Unit investigated what was left of the burned buildings. In his expert opinion, the fires had been intentionally set. Upon learning about the cut trees, he returned to the property and determined that markings left on them were consistent with the use of a bow saw.

The evidence at trial showed that Bass had purchased a bow saw at some time after the house burned and later sent his mother-in-law into a local hardware store to buy another bow saw for him.

In December 1997, Miller noted that Bass had not complied with the municipal court order. She testified that, as she was taking pictures that month of the dogs on Bass's property, Bass spotted her, grabbed her camera from her, beat it upon a tree until it broke apart, and "snatched" her (then 73 years old), causing her to fall to the ground.

That same month, Bass's appeal to the superior court was dismissed for failure to file a petition for writ of certiorari. His application for discretionary appeal from that dismissal was denied by this court. The following month, March 1998, the municipal court issued an order finding Bass in contempt, ordering the chief of police to impound all but three of Bass's dogs, and imposing upon Bass a contempt fine and impound costs. The dogs were thereafter removed, as ordered, from Bass's property.

Starting that same month, a wave of crimes were perpetrated upon the vehicles of individuals who had signed the nuisance petition and then testified against Bass. In each instance, the vehicle damaged was parked at the respective owner's home, which was in Bass's neighborhood.

| | |
|---|---|
| March 14 | The four tires on Moshell's car were flattened and "666" was scratched on the side of her car during the night. |
| April 6 | The four tires of Riley's car were flattened during the night. |
| April 6 | The eight tires on Dan and Sheryl Harris's car and truck were flattened. |
| April 6 | The four tires on Goff's truck were flattened and "666" was scratched onto the side of the truck. |
| April 23 | The four tires on Riley's car were flattened again. |
| April 23 | The four tires on Goff's truck were flattened again. |

According to a tire shop owner who examined and then replaced some of the flattened tires, each tire had been "damaged the same way, with holes through the side where you couldn't patch them."

Moshell's next door neighbor testified that, at about 2:00 on the morning Moshell's car was vandalized, he saw a man walk alone down Moshell's driveway. The neighbor testified that he did not see the man's face, but observed that the man had the same gait, size, and general appearance as a man he had seen occasionally walking a dog on his street. The neighbor testified that, during that time, he did not know the name of the man who sometimes walked a dog, but the county sheriff, Gary Wilson, later identified the man to him as "Ronald Bass."

On April 23, Wilson went to Goff's house in response to a complaint about flattened tires. He investigated the vehicle there and also the one at Riley's house. Wilson summoned a canine handler with the Georgia Department of Corrections and the Georgia Bureau of Investigation (GBI) for assistance.

The canine handler investigated the scene around Riley's car with a human-tracking bloodhound dog. He testified that the dog had picked up a human scent at the car and tracked it to the back steps of the house next door. Likewise, Wilson testified that the dog went "through the hedge row between Mr. Bass's house and Ms. Riley's yard" toward Bass's house. Wilson and an agent of the GBI who had arrived in response to Wilson's summon followed the dog and its handler to the house next door. It was Bass's home. The sheriff and the agent explained to Bass their presence. Bass named his wife and son as the only other occupants at that time.

Five days later, on April 28, officers from the Sheriff's Office, the Georgia State Fire Marshal's Arson Unit, and the GBI executed a search warrant upon Bass's residence. The search yielded two bow saws.

Bass testified that his family started keeping dogs at their residence around 1994 and that a letter from Miller was the first complaint he received about them. He recalled, "I was more frustrated than anything else because I couldn't understand how somebody that, you know, doesn't live somewhere can come and start basically wanting to order you what to do and what you can and can't do in your own back yard." He explained that his remark to Miller referencing William T. Sherman was not a threat of any property damage, but only a warning that "I was going to fight her." As background for that remark, he described his lifelong interest in Civil War history and stated that, on the day Miller appeared with the letter, he had been working on a presentation about Sherman's March to the Sea.

Bass testified that his attorney in the municipal court matter had advised him that he stood little chance of prevailing, but he chose to fight the nuisance action because he strongly believed that he had a constitutional right to keep his dogs on his private property. He testified that he was not angry, but "frustrated" by his neighbors' testimony at the hearing on the nuisance petition.

Bass denied any involvement in the fires underlying the arson charges; he and his wife testified that he had been at home when the fires started. He also denied cutting down the trees and damaging the vehicles. Further, Bass testified that his December 1997 altercation with Miller had erupted only after she refused his demands to leave his property and stop taking pictures of him and his residence. He testified that he did not put his hands on her, did not take her camera from her, and did not smash the camera.

Bass was indicted for 24 charges and twice tried by jury in Randolph County. The jury in his first trial found him guilty only of committing simple battery upon Miller. That trial ended with a hung jury on the remaining 23 charges. Sentencing on the simple battery charge was withheld until the conclusion of Bass's second trial.

The jury at Bass's second trial, the trial underlying this appeal, returned guilty verdicts on those other 23 charges. After various mergers, Bass was convicted and sentenced on one count of first degree arson for burning the house owned by Miller's relatives; two counts of second degree arson for burning their barn-type storage shed and garage; three counts of second degree criminal damage to property for cutting trees on their property; robbery by sudden snatching for taking a camera from Miller; criminal trespass for smashing the camera against a tree; simple battery for causing bodily

injury to Miller by shoving her to the ground; and six counts of second degree criminal damage to property for damaging the vehicles of Moshell, Riley, the Harrises, and Goff.

1. Bass contends that the state failed to prove venue for the offenses charged in: (a) Count 17 — criminal damage in the second degree, by puncturing the tires of Dan and Sheryl Harris's car and pickup truck; and (b) Count 18 — criminal trespass, by entering the Harris's residential lot for the unlawful purpose of committing criminal damage by puncturing the tires of their vehicles.[1]

Nancy Burgin, who lived in Bass's neighborhood, described the layout of the residences there, testifying that the Harris's residence was "probably five or six houses past the Bass house." Later, she was asked, "Now, the residences that you have referred to in this case, are all of those residences located in Cuthbert and Randolph County, Georgia?" She replied, "Yes, sir." Burgin's testimony authorized the jury to find beyond a reasonable doubt that the offenses charged in Counts 17 and 18 occurred in Randolph County.[2]

2. Bass contends that the trial court should have granted him a new trial based on his claim pursuant to *Strickland v. Washington*[3] of ineffective assistance of counsel.

> The burden of establishing the ineffective assistance of trial counsel is a heavy one that requires an appellant to establish both that counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different.[4]

With respect to the deficiency prong, Bass must overcome a "strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance."[5] Absent testimony to the contrary, "counsel's actions are presumed strategic and are virtually unassailable as ineffective."[6] Both the performance and

---

[1] Count 18 was merged into Count 17 for sentencing purposes.

[2] See *Jones v. State*, 272 Ga. 900, 901 (2) (537 SE2d 80) (2000) (like every other material allegation in the indictment, venue must be proved beyond a reasonable doubt).

[3] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[4] (Footnote omitted.) *Reed v. State*, 248 Ga. App. 107, 108 (1) (545 SE2d 655) (2001). See *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).

[5] (Citations and punctuation omitted.) *Worthy v. State*, 286 Ga. App. 77, 79 (2) (648 SE2d 682) (2007).

[6] (Citations and punctuation omitted.) *Smith v. State*, 282 Ga. App. 339, 345 (4) (638 SE2d 791) (2006).

prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[7] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[8]

(a) Citing cases such as *Turner v. Louisiana*,[9] *Radford v. State*,[10] and *Bishop v. State*,[11] Bass argues that his trial counsel performed deficiently by failing to object when the trial court allowed Wilson, the sheriff who had testified as a state witness, to act as bailiff. Wilson began acting as bailiff at the start of the third day of the four-day trial; the state had rested its case-in-chief at the close of the second day.

> In *Turner*, two key prosecution witnesses, who were also deputy sheriffs, acted as jury bailiffs throughout a three-day trial. The [United States Supreme] Court explained that it would have undermined the basic guarantees of trial by jury for two key prosecution witnesses to have associated with the jury in any event, but their role as sheriff's deputies made the association even more prejudicial. And this was true notwithstanding an assumption that the facts of the case were not discussed in the many conversations between the two witness-bailiffs and the jury.[12]

Subsequently, the Supreme Court of Georgia instructed in *Radford* that

> *Turner* did not set down a rigid, per se rule automatically requiring the reversal of any conviction whenever any government witness comes into any contact with the jury. *Turner* specifically indicated that association with the jury by a witness whose testimony was confined to some uncontroverted or merely formal aspect of the case for the prosecution would hardly present a constitutional problem. And it indicated that a mere brief encounter, by chance, with the jury would not generally contravene due process principles.

---

[7] *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

[8] *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

[9] 379 U. S. 466 (85 SC 546, 13 LE2d 424) (1965).

[10] 263 Ga. 47 (426 SE2d 868) (1993).

[11] 268 Ga. 286 (486 SE2d 887) (1997).

[12] (Punctuation omitted.) *Radford*, supra at 48 (1) (analyzing *Turner*, supra).

Certain chance contacts between witnesses and jury members, while passing in the hall or crowded together in an elevator, are often inevitable.[13]

Thereafter, the Supreme Court of Georgia explained in *Bishop* that "contact between the jury and a witness for the State who is also an officer of the court is not grounds for an automatic reversal. The factors to be considered are the type and duration of the contact and the significance of the testimony."[14]

Had trial counsel objected to the sheriff serving as bailiff in this case — after having testified for the state during the trial — the trial court could have granted Bass a new trial under the precedents discussed above; however, there was no objection here, and this court will not impose a per se rule that failure to object in these circumstances is ineffective assistance of counsel. The circumstances are always local, and such matters are usually best left to the experienced trial judge presiding and to the judgment and instincts of the adversarial trial counsel.[15]

From a cold record and distance from the scene, we cannot discern whether the defendant in fact was prejudiced or not by the allowing of the elected sheriff to serve as bailiff.[16] The circumstances here differed significantly from those in, for example, *Turner*[17] and *Gonzales*,[18] in which the sheriff or deputy sheriffs ate meals with the jurors and conversed with them. By contrast, in our case, the sheriff/bailiff sat outside the jury room in the view of the judge, the district attorney, the defendant, and the defendant's retained trial counsel, Mr. Ronick. The foreperson of the jury, although she had known the sheriff all of her life, did not remember whether he had, at some point in the trial, become bailiff or not.

The function of a "bailiff" in taking charge of a jury can vary considerably in Georgia from county to county and from trial to trial. In the case of this appellant, Ronald Bass, the sheriff's actual role at trial was significantly different from that discussed in the authoritative precedents. To be sure, the sheriff had testified for the state at trial. Thus his contacts with the jury, although supervised by the

---

[13] (Citations and punctuation omitted.) Id., citing *Gonzales v. Beto*, 405 U. S. 1052, 1054-1055 (92 SC 1503, 31 LE2d 787) (1972) (Stewart, J., concurring).

[14] (Citation omitted.) *Bishop*, supra at 293 (10).

[15] Here, trial counsel's death before the hearing on the motion for new trial prevented a thorough examination of the reasons behind any challenged actions.

[16] Bass's appellate counsel affirmatively stated at oral argument before this court that Bass is not contending presumptive prejudice.

[17] Supra.

[18] Supra.

judge and usually observed by the defendant and trial counsel, could have rendered his service as bailiff improper if objection had been made. But defendant's trial counsel expressly said he had no objection. We cannot say that, as a matter of law, such consent automatically equals to ineffective assistance of counsel.

(b) Bass contends that counsel was deficient in failing to object to the state's evidence that a bloodhound dog had tracked a human scent from a crime scene to his back door. He asserts that the evidence was inadmissible because there was no showing that such type of tracking had reached a scientific stage of verifiable certainty under the test set forth in *Harper v. State*.[19]

The Supreme Court of Georgia has explained that the type of evidence commonly subjected to the *Harper* test is "expert opinion based on an analysis of data, an opinion that could only be based on something more than mere observation. Of course, if the conclusion at issue could be drawn by anyone based on observation, there would be no need for expert testimony."[20] In *Al-Amin v. State*,[21] the Supreme Court of Georgia applied this rationale to determine whether the *Harper* standards should have been met with respect to contested evidence that tracking dogs had located the appellant who had retreated into woods.[22] The Court held, "Because this is evidence which is within the ken of the average layperson, it was not necessary that the *Harper* standards be met."[23] Similarly, the contested evidence in this case is the use of a dog to track a human scent. Thus, there is no requirement to show that the *Harper* standards are met for admissibility.[24]

Bass's reliance upon *Carr v. State*[25] is misplaced because the type of evidence at issue in *Carr* is distinguishable from the type of evidence at issue both here and in *Al-Amin*. In *Carr*, the contested evidence was a dog handler's testimony that a dog's behavior — lying down, pointing with his nose, or pawing the ground — showed that an accelerant was present at a site being investigated for arson.[26] The Supreme Court of Georgia determined that such evidence was expert

---

[19] 249 Ga. 519, 523-526 (1) (292 SE2d 389) (1982).

[20] *Carr v. State*, 267 Ga. 701, 702-703 (482 SE2d 314) (1997), overruled on other grounds, *Clark v. State*, 271 Ga. 6, 10 (5) (515 SE2d 155) (1999).

[21] 278 Ga. 74 (597 SE2d 332) (2004).

[22] Id. at 81 (10).

[23] Id.

[24] See id.; see generally *Mitchell v. State*, 202 Ga. 247, 248 (4) (42 SE2d 767) (1947) (concerning the admissibility of testimony as to the conduct of dogs when taken to the scene of a crime); *Johnson v. State*, 165 Ga. App. 146 (299 SE2d 740) (1983) (concerning the admissibility of evidence as to the conduct of a human-tracking dog).

[25] Supra.

[26] Id. at 701-703.

testimony subject to the requirements of *Harper*, explaining that the average layperson would not be able to conclude from watching the dog's behavior that an accelerant was present, but could have reached that conclusion only with the dog handler's analysis of the dog's behavior.[27] Because the evidence was admissible, trial counsel cannot be found ineffective for failing to object thereto.[28]

(c) Bass contends that trial counsel was ineffective for failing to object when the state's arson expert invaded the province of the jury by "improperly [instructing] the petit jury that whoever cut the trees, set these fires and whoever set the fires, cut the trees." Bass asserts that, while there was some evidence connecting him to the tree cuttings, i.e., the bow saws, there was no evidence — save the expert's improper testimony — connecting him to the arson offenses.

The record shows that the arson expert explained on direct examination why he went to Miller's relatives' property upon learning that trees had been cut down. The expert testified that he was also a POST-certified police officer and that his job as an arson investigator was not merely to determine whether the fires had been deliberately set, but to determine who had done so upon a determination of arson. Having investigated on three separate occasions the burnings of different buildings on the same property and subsequently being informed that trees thereon had been unlawfully cut down, the arson investigator considered a possible connection between the burnings and the tree cuttings and thus returned to the property to investigate the tree-cutting incidents. The expert testified, "I felt that if I could find who is setting the fires I could find who is cutting the trees, if I could find who is cutting the trees I can find who is setting the fires." We reject Bass's claim that the testimony constitutes an impermissible comment on the ultimate issue in the case. The testimony merely posited a connection between the two crimes; it did not directly implicate Bass as the perpetrator.[29] Since the testimony was not an impermissible comment on the ultimate issue in the case, trial counsel cannot be found ineffective for failing to object thereto.

(d) Bass argues that trial counsel was ineffective in failing to object to the testimony of the municipal court judge who was to have presided over the hearing on the nuisance petition that she had been afraid that Bass would burn a house her husband owned in Bass's

---

[27] Id. at 703.

[28] See *Foster v. State*, 286 Ga. App. 250, 255 (3) (b) (649 SE2d 322) (2007).

[29] See, e.g., *Hester v. State*, 261 Ga. App. 614, 617 (3) (b) (583 SE2d 274) (2003).

neighborhood and would burn the rest of the town. Bass complains that such testimony was an improper comment on his future dangerousness.

The municipal court judge was called by the state after the defense closed its case. The state asserts that it called the judge to impeach defense witness Clayton Smith, the attorney who had represented Bass in the nuisance action. That attorney had testified that Bass exhibited no anger at the hearing on the nuisance petition.

The municipal court judge did not testify about Bass's demeanor at the nuisance hearing. She testified about a conversation she had with Bass's attorney shortly before the contempt hearing. According to the judge, Bass's attorney advised her that Bass had only a year to live because of an illness; that he did not care whether he spent his last year at home or in prison; that he did not care if he "killed everybody involved" or burned down every house in town; and that Bass had recently learned that her husband owned a house in his neighborhood.[30] The judge recalled, "It concerned me that he made such a threat." She recused herself from the contempt hearing.

We agree with Bass that the municipal court judge's testimony was beyond admissible impeachment evidence and should have been excluded. Evidence about a defendant's future dangerousness "simply is irrelevant to the question of whether, under the facts introduced into evidence, the defendant is guilty beyond a reasonable doubt of the crime charged."[31] Also irrelevant to that question were the municipal court judge's reactions to statements attributed to Bass. Again, however, we are reluctant to decree an automatic rule that failure to object to the inadmissible testimony of an important witness is per se ineffective assistance of counsel. Bass was represented at trial by retained counsel, i.e., counsel of his own choosing. In hindsight, that counsel's performance at trial seems questionable in several aspects. But, we cannot hold as a matter of law that counsel's failure to object to the municipal court judge's testimony was ineffective assistance of counsel.

3. Bass complains that the trial court gave an erroneous jury instruction concerning alibi. The court charged:

The Defendant contends that he was not present at the scene of the alleged offense at the time of its commission. Alibi as a defense involves the impossibility of the Defendant's presence at the scene of the alleged offense or offenses at the time

---

[30] The attorney who represented Bass in the nuisance case denied knowing at the time of the hearing that the judge's spouse owned a house in Bass's neighborhood and making any statement to the judge even suggesting that any such house was in danger.

[31] *Wyatt v. State*, 267 Ga. 860, 864-865 (2) (b) (485 SE2d 470) (1997).

of its commission. The evidence presented with respect to time and place must be such as to reasonably exclude the possibility of the presence of the Defendant at the scene of the alleged offense or offenses. Presence of the Defendant at the scene of the alleged crime is an essential element of the crime set forth in this indictment, and the burden of proof rests upon the State to prove such beyond a reasonable doubt.

In *Chapel v. State*,[32] the Supreme Court of Georgia considered this language and determined, "The third sentence is unfortunate in suggesting that a burden of proof rests with the defendant and the charge would be correct and better without it."[33] Although the *Chapel* Court determined that the third sentence created no reversible error because "the final sentence is clear in instructing that the burden of proof rests completely with the state,"[34] the third sentence should be omitted.[35] Accordingly, the giving of this charge did not constitute reversible error.

4. Lastly, Bass contends that the trial court erred in denying his amended motion for new trial because the state committed a *Brady*[36] violation by not revealing to him that a reward would be paid to witnesses if he was convicted. According to Bass, two prosecution witnesses received reward money from the state after he was convicted and sentenced. However, Bass further asserts that neither witness knew about the possibility of a reward until *after* they testified at trial.

Pretermitting whether Bass has preserved this claim of error for review, it is without merit. *Brady* holds that the suppression by the prosecution of evidence favorable to a criminal defendant is a violation of due process.[37] "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[38] Bass has not demonstrated how he was prejudiced. He contends that the undisclosed evidence "could have affected the outcome of the case as

---

[32] 270 Ga. 151 (510 SE2d 802) (1998).

[33] Id. at 157 (7).

[34] Id.

[35] See further Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (3rd ed.), § 3.11.10 (Alibi).

[36] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[37] Id. at 87.

[38] *Callahan v. State*, 280 Ga. App. 323, 326 (1) (b) (634 SE2d 102) (2006).

witnesses [sic] credibility could have been properly weighed by the jury." However, since the witnesses did not learn of the existence of the reward money until after they testified, we fail to see how the nondisclosure prejudiced appellant.

*Judgment affirmed. Johnson, P. J., concurs. Smith, P. J., and Bernes, J., concur in the judgment only. Phipps, J., concurs in part, concurs in the judgment only in part, and dissents in part. Blackburn, P. J., and Ruffin, J., concur in the judgment only in part and dissent in part.*

PHIPPS, Judge, concurring in part, concurring in judgment only in part, and dissenting in part.

Because Bass was deprived of effective assistance of counsel by the failure of trial counsel to object when the trial court allowed Wilson — the sheriff who had investigated the case and testified as a key witness for the prosecution — to act as bailiff, his convictions (except for simple battery)[39] should be reversed. Therefore, regarding the majority's Division 2 (a), I concur in part and dissent in part. I concur fully with the majority's Divisions 1, 2 (b), and 3. Regarding all remaining divisions, I concur in the judgment only.

To prevail on such a claim, a defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial to his defense.[40] Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[41] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[42]

(a) *Deficient Performance.* Bass argues that his trial counsel performed deficiently by failing to object when the trial court allowed Wilson — the sheriff who had investigated the case and who testified as a key prosecution witness — to then act as bailiff of the jury in the trial. Wilson began acting as bailiff at the start of the third day of the four-day trial; the state had rested its case-in-chief at the close of the second day. Bass cites cases such as *Turner v. Louisiana,*[43] *Radford v. State,*[44] and *Bishop v. State.*[45]

---

[39] See further part (c) of this dissent.
[40] See *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).
[41] *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).
[42] *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).
[43] 379 U. S. 466 (85 SC 546, 13 LE2d 424) (1965).
[44] 263 Ga. 47 (426 SE2d 868) (1993).
[45] 268 Ga. 286 (486 SE2d 887) (1997).

In *Turner*, two key prosecution witnesses, who were also deputy sheriffs, acted as jury bailiffs throughout a three-day trial. The [United States Supreme] Court explained that it would have undermined the basic guarantees of trial by jury for two key prosecution witnesses to have associated with the jury in any event, but their role as sheriff's deputies made the association even more prejudicial. And this was true notwithstanding an assumption that the facts of the case were not discussed in the many conversations between the two witness-bailiffs and the jury.[46]

Subsequently, the Supreme Court of Georgia instructed in *Radford* that

*Turner* did not set down a rigid, per se rule automatically requiring the reversal of any conviction whenever any government witness comes into any contact with the jury. *Turner* specifically indicated that association with the jury by a witness whose testimony was confined to some uncontroverted or merely formal aspect of the case for the prosecution would hardly present a constitutional problem. And it indicated that a mere brief encounter, by chance, with the jury would not generally contravene due process principles. Certain chance contacts between witnesses and jury members, while passing in the hall or crowded together in an elevator, are often inevitable.[47]

Thereafter, the Supreme Court of Georgia explained in *Bishop* that "contact between the jury and a witness for the State who is also an officer of the court is not grounds for an automatic reversal. The factors to be considered are the type and duration of the contact and the significance of the testimony."[48]

In this case, the interaction between the jury and Wilson, the witness for the state who also acted as an officer of the court, was not limited to passing in the hall, being crowded together in an elevator, or to some other brief, chance encounter that generally would not contravene due process principles. Rather, Wilson acted as bailiff from the start of the defense presentation of its case through the end

---

[46] *Radford*, supra at 48 (1) (punctuation omitted) (analyzing *Turner*, supra).

[47] Id. (citations and punctuation omitted) (citing *Gonzales v. Beto*, 405 U. S. 1052, 1054-1055 (92 SC 1503, 31 LE2d 787) (1972) (Stewart, J., concurring)).

[48] *Bishop*, supra at 293 (10) (citation omitted).

of the trial, until the jury reached its verdict. Under such circumstances, Wilson had substantial and continuing contact with and authority over the jurors during a significant portion of the trial.[49]

As Bass had pled not guilty to the 23 counts under consideration by the jury, the state had the burden of proving beyond a reasonable doubt every element of these offenses.[50] In meeting this burden, the state relied upon testimony by the sheriff that was not " 'confined to some uncontroverted or merely formal aspect of the case for the prosecution,' "[51] but testimony that tended to show Bass's guilt. Wilson, who had both participated in and supervised the investigations of some of the charged crimes, was a key witness for the prosecution.

Under these circumstances, permitting the sheriff to play the dual roles of a key state witness and bailiff undermined the basic guarantees of trial by jury.[52] "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors."[53] A safeguard of that right is a jury free of outside influence, which is implemented, in part, "by the presence of bailiffs, officers of the court designated as unbiased administrative attendants, whose sworn duty is to take custody of the jury. . . ."[54]

> Our adversary system of criminal justice demands that the respective roles of prosecution and defense and the neutral role of the court be kept separate and distinct in a criminal trial. When a key witness against a defendant doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a

---

[49] See *Gonzales,* supra (reversing conviction under *Turner,* supra, where county sheriff played dual roles of key prosecution witness and bailiff at a trial that lasted only one day and the jury was not sequestered with the county sheriff).

[50] See *Tompkins v. State,* 278 Ga. 857, 858 (1) (607 SE2d 891) (2005) (a plea of not guilty requires the state to prove every element of the crime charged).

[51] *Radford,* supra at 49 (4) (quoting *Turner,* supra at 473).

[52] See *Turner,* supra at 473-474; *Radford,* supra at 49-50 (4)-(6); see also *Gonzales,* supra at 1053-1054 (Stewart, J., concurring) (cited with approval in *Radford,* supra at 48-50 (1), (6)); see *Yelton v. State,* 277 S2d 912, 914-915 (I) (Ala. Crim. App. 1973) (because basic guarantees of a jury trial are undermined by permitting certain commingling between jurors and a witness in a position of authority, reversible error occurred in allowing any association of the jury with a witness who had testified at trial, even though sheriff's interaction with jurors did not approach the prohibited behavior in *Turner,* supra), rev'd on other grounds, 317 S2d 331 (1974); accord *Turpin v. Todd,* 271 Ga. 386, 390 (519 SE2d 678) (1999) (recognizing that the very nature of the bailiff's position serves to heighten the prejudicial potential a bailiff's communication may have on the jury).

[53] *Turner,* supra at 471 (citation and punctuation omitted).

[54] *Turpin,* supra at 389; see OCGA § 15-12-140.

personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice is perverted.[55]

The Supreme Court of Georgia has plainly "condemn[ed] allowing law enforcement officers who give key testimony for the State to be charged with the care and protection of the jurors."[56] There is no question that Bass's trial counsel performed deficiently by failing to object to Wilson acting as bailiff.[57]

(b) *Prejudice.* In assessing the prejudice component of an ineffectiveness claim,[58] a court must consider the totality of the evidence to determine the effect of trial counsel's deficient performance.[59] "Some errors [by trial counsel] will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect."[60]

While the evidence in this case was sufficient to support Bass's convictions,[61] it was not overwhelming. The case was largely circumstantial and hinged on the credibility of the prosecution witnesses, one of whom was Wilson. Wilson described what he and others in his office had done to investigate the crimes, including conducting more than a dozen stakeouts in connection with the fires, and examining the scenes of damaged vehicles. In addition, evidence showed that the sheriff's office had participated in the execution of the search warrant upon Bass's residence that yielded the type of saw that could have been used to cut down the trees.

Moreover, Wilson corroborated the testimony concerning the tracking dog by other prosecution witnesses. In addition, Wilson was recalled to the stand immediately after Moshell's neighbor testified about the man he had observed walking down Moshell's driveway the night Moshell's car was vandalized. The neighbor had testified that he did not know Bass by name as of that night, but that the sheriff later identified Bass to him. On recall, Wilson testified about his interview with the neighbor concerning that night. According to Wilson, Moshell's neighbor already knew Bass and reported during the interview that the man he had observed walked and looked like

---

[55] *Radford,* supra at 49-50 (6) (citation omitted).

[56] *Bishop,* supra at 293 (citation and punctuation omitted).

[57] See *Gonzales,* supra; *Turner,* supra; *Yelton,* supra; see also *Jowers v. State,* 260 Ga. 459, 462 (396 SE2d 891) (1990) (counsel's function is to make the adversarial testing process work in the particular case).

[58] Bass's appellate counsel affirmatively stated at oral argument before this court that Bass is not contending presumptive prejudice.

[59] *Strickland v. Washington,* 466 U. S. 668, 695 (104 SC 2052, 80 LE2d 674) (1984).

[60] Id. at 695-696.

[61] See *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Bass, but he (the neighbor) would not identify the person as Bass for fear his house would be burned down.

"Issues regarding the credibility of the witnesses fall solely within the province of the jury."[62] Yet, during significant parts of the trial, including jury deliberations, the sheriff was acting as bailiff. The official character of bailiff — as an officer of the court — beyond question carries great weight with a jury, as the court has placed the jury in the bailiff's charge and care.[63] This role could only foster the jurors' confidence in one who was their official guardian during significant periods of the trial and lead to undue emphasis being placed upon his testimony and the part he and his office played in investigating the underlying crimes.[64]

Furthermore, the record shows that Wilson had been the county's elected sheriff since 1985. It has been recognized that

> [a]ny person holding the office of sheriff is not only recognized as the symbol of that county's law, but is the law to his constituents when he speaks. It is for this reason that the testimony of such an officer may influence a jury's verdict, and the impact of his presence [as bailiff] is increased considerably whenever he is brought into such close company with the jurors.[65]

Since *Turner*, the United States Supreme Court has reiterated the proposition that a jury cannot, "consistent with due process, try a case after it ha[s] been placed in the protective custody of the principal prosecution witnesses, notwithstanding the possibility that the jurors might not be influenced by the association."[66] Thus, I cannot agree with the majority's reasoning to affirm this case because of the lack of evidence that the sheriff ate meals with the jurors and because the sheriff testified that, while acting as bailiff, he restricted his association with the jurors to the judge's instructions. In light of *all* the foregoing, I find these points of little to no consequence because, as the Supreme Court of the United States has held, "even if it could be assumed that the [sheriff] never did discuss the case directly with any members of the jury, it would be blinking at reality not to recognize the extreme prejudice inherent in the continual

---

[62] *McKee v. State*, 280 Ga. 755, 756 (1) (632 SE2d 636) (2006) (citation omitted); see OCGA § 24-9-80.

[63] *Parker v. Gladden*, 385 U. S. 363, 365 (87 SC 468, 17 LE2d 420) (1966); accord *Turpin*, supra at 390.

[64] See *Turner*, supra at 474; *Yelton*, supra at 914.

[65] *Yelton*, supra; see *Turner*, supra at 474.

[66] *Peters v. Kiff*, 407 U. S. 493, 502 (92 SC 2163, 33 LE2d 83) (1972).

association [during] the trial between the jurors and [this] key witness[ ] for the prosecution."[67]

Nor can I agree with the majority's reasoning to affirm what happened in this case merely for the sake of deferring to (perceived) local circumstances or practices commonly employed by trial court judges. And while the majority labels as strategy the trial counsel's failure to object as trial,

> invoking the words "tactics" and "strategy" does not automatically immunize trial counsel against a claim that a tactical decision or strategic maneuver was an unreasonable one no competent attorney would have made under the same circumstances. "Tactics" and "strategy" provide no talismanic protection against an ineffective assistance of counsel claim. Even assuming that trial counsel in this case knowingly made the tactical decision to forego [an objection], it [was] not a *reasonable* decision a competent attorney would have made under the same circumstances.[68]

Counsel's error reviewed here — failing to object to the sheriff's roles as state's witness and bailiff — did not have a mere isolated, trivial effect, but a pervasive effect on the inferences to be drawn from the evidence.[69] The factors relied upon by the majority fail to negate the prejudice in this case. Because the circumstances of this case show a reasonable probability (i.e., "a probability sufficient to undermine confidence in the outcome"[70]) that, but for counsel's deficient performance, the result of the proceeding would have been different, I believe we should reverse all of Bass's convictions, except for simple battery.

(c) *Simple Battery Conviction.* In his first trial, Bass was found guilty of simple battery against Miller. In the second trial, the jury was not asked to consider that charge; instead, the parties stipulated to the verdict from the first trial; therefore, that verdict could not have been affected by the sheriff acting as bailiff.

RUFFIN, Judge, concurring in judgment only in part and dissenting in part.

Because I believe that it is presumptively prejudicial when a key State's witness serves as a bailiff charged with the jury's care, I am

---

[67] *Turner,* supra at 473; see *Radford,* supra at 48.

[68] *Benham v. State,* 277 Ga. 516, 518 (591 SE2d 824) (2004) (citation and punctuation omitted; emphasis in original).

[69] *Strickland,* supra at 695-696.

[70] Id. at 694.

compelled to dissent as to Division 2 of the majority's opinion.[71] I concur in the judgment only with respect to the remaining divisions.

There is a reason why court decisions uniformly condemn permitting law enforcement officers who are key witnesses for the State to serve as bailiffs, in charge of jurors.[72] It is because, to hold otherwise, is fundamentally unfair to criminal defendants and undermines our system of justice. The Constitutions of both Georgia and the United States guarantee a criminal defendant the right to trial by an *impartial* jury.[73] As former trial judges, we know that a bailiff can develop a unique rapport with the jury.[74] The bailiff is the person who ensures the jurors' presence and comfort, ushers them in and out of the jury room, and serves as the conduit between jurors and the judge. Given the bailiff's position of power, jurors may conceive a fondness, a respect, or possibly even a fear of the bailiff. What jurors do not have is an impartiality toward the bailiff. And lack of impartiality may translate into enhanced credibility of the bailiff-witness.

Moreover, I cannot conceive of a *legitimate* tactical reason for trial counsel's failure to object to such a situation. Arguably, trial counsel was motivated by a desire to avoid antagonizing the judge.[75] Nevertheless, such motivation should never override his overarching obligation to ensure that his client obtains a fair trial by an impartial jury untainted by inappropriate exposure to any trial witness.

I am authorized to state that Presiding Judge Blackburn joins in this opinion.

DECIDED NOVEMBER 30, 2007 — 

*Brian Steel*, for appellant.
*Charles M. Ferguson, District Attorney*, for appellee.

---

[71] As with any presumption, it is rebuttable. See *Bishop v. State*, 268 Ga. 286, 293 (10) (486 SE2d 887) (1997) (although deputy's contact with jurors was improper, reversal was not required given lack of contact with jurors). Apparently, Bass's appellate counsel chose not to argue at oral argument that the sheriff's dual role as both witness and bailiff was presumptively prejudicial. It appears to me, however, that the majority presumes lack of prejudice. Given the important constitutional right at stake, I think the presumption should be otherwise.

[72] See *Turner v. Louisiana*, 379 U. S. 466 (85 SC 546, 13 LE2d 424) (1965); *Bishop*, supra; *Radford v. State*, 263 Ga. 47, 48 (1) (426 SE2d 868) (1993).

[73] See Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a); U. S. Const., Amend. 6.

[74] I note that five of the seven judges on this panel are former trial judges.

[75] Trial counsel died before the hearing on Bass's motion for new trial could be heard. Thus, we have no testimony regarding his alleged strategy — or lack thereof — in failing to object to the sheriff's dual role as witness and bailiff.